UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**FILED - MQ**

May 31, 2023 9:59 AM

U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:____slk____ / ꟼ L 5 - 3 1 - 23

United States of America
*ex rel.* Jesse Koenig, and
Jesse Koenig individually,

      Plaintiffs,

-vs-

Keweenaw Bay Ojibwa Community College,
Lori Ann Sherman (President),
Beth Louise Vertanin (Dean of Instruction), & Robin Chosa
(Chairman of the Board) Individually and as
Representatives of Keweenaw Bay Ojibwa
Community College,

      Defendants.

_____/

**2:23-cv-103**

**Paul L. Maloney, U.S. District Court**
**Maarten Vermaat, U.S. Magistrate Judge**

Case No._____
Hon._____

## COMPLAINT
## FILED IN CAMERA
## UNDER SEAL PURSUANT TO LOCAL RULE 5.7(d)(ii)(B)
## FALSE CLAIMS ACT

## STATEMENT OF INTRODUCTION:

    *Qui Tam Relator*/Plaintiff, Jesse Koenig, hereinafter (Koenig/Plaintiff), on behalf of the United States of America, and as an individual plaintiff, through his attorneys, the Law Offices of Hurlburt, Tsiros, & Allweil P.C., by Mandel I. Allweil, alleges in the following Complaint that the named Defendants, as more fully described below, defrauded the United States, and as a direct result of his intervention to stop, and/or bring attention to the fraud, the Plaintiff Koenig was retaliated against and ultimately terminated despite having amassed a pristine work record. As such, Koenig avers, with more specificity, the following on the behalf of the United States *ex rel* Koenig:

## I.     **THE PARTIES:**

**1.**

Plaintiff Jesse Koenig is, and was it all times relevant hereto, a resident of L'Anse, MI, in the County of Baraga, State of Michigan.

**2.**

The Defendant, The Keweenaw Bay Ojibwa Community College (KBOCC), is engaged in the business of supplying and providing higher educational services to members of the greater secular community of L'Anse Michigan, the surrounding Upper Peninsula of Michigan, as well as members of the Keweenaw Bay Indian Community (KBIC).

**3.**

Defendant KBOCC resides and transacts business in the City of L'Anse, County of Baraga, State of Michigan, on non-tribal lands, located at 770 North Main Street, L'Anse M 49946, and is not an arm of the Tribe.

**4.**

Specifically, KBOCC is an independent, non-profit educational corporation, operating off the reservation, and not part of the for-profit businesses run by the Tribe and is not entitled to any type of sovereign immunity

**5.**

KBOCC has boasted and bragged about its independence from the Tribe as a major part of their processes of achieving and attempting to maintain Higher Learning Commission (HLC) accreditation and, in turn, receiving Federal Financial Aid (FFA).

**6.**

As far back as 2010, KBOCC officially separated all accounting operations from KBIC. That is all payroll, accounts receivable, accounts payable, retirement funds, all general ledger activities, and a panoply of other services, were completed by the Business Office at KBOCC.

**7.**

Upon information and belief, the KBIC reduced and/or eliminated funding to the KBOCC, starting in or about 2012, to financially distance relationships between the KBIC and the KBOCC.

8.

Defendant Beth Virtanen, at all relevant times hereto, was the acting Dean of Instruction at KBOCC (and is not a member of the Keweenaw Bay Indian community (KBIC)), and on information and belief resides at 931 Bayshore Road, L'Anse MI 49946 and suit in this instant is brought against Ms. Virtanen in her individual capacity, and she is a real party in interest for her intentional and unlawful submission of false claims and retaliation pursuant to the FCA as well as the laws of the State of Michigan and is not entitled to any qualified immunity.

9.

Defendant Lori Ann Sherman, at all relevant times hereto, was the acting President of KBOCC, and on information and belief resides at 12188 US Highway 41, Pelkie, MI 49958 and suit in this instant is brought against Ms. Sherman in her individual capacity, and she is a real party in interest for her intentional and unlawful submission of false claims and retaliation pursuant to all relevant sections of the FCA, including but not limited to sections raised above/below, as well as the laws of the State of Michigan and is not entitled to any qualified immunity.

10.

Defendant Robin Chosa, at all relevant times hereto, was the acting Chairman of the KBOCC Board, and on information and belief resides at 775 Makwa Miikana, Baraga, MI 49908-9223 and in this instant is brought against Mr. Chosa in his individual capacity and he is a real party in interest for his intentional and unlawful submission of false claims and retaliation pursuant to all relevant sections of the FCA, including but not limited to sections raised above/below, as well as the laws of the State of Michigan and is not entitled to any qualified immunity.

II.   **VENUE AND JURISDICTION**:

11.

Pursuant to 28 USCA 1331 this Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. As such, because the allegations arising herein involve a panoply of actions arising under the False Claims Act, (FCA) including, 31 USCA §§ 3729(A)(1-3) and by discharging and retaliating against Plaintiff/Koenig in violation of 31 USCA §3730(b)(1) and 3732 this Court has proper jurisdiction.

12.

Likewise, pursuant to 28 USCA §1367 this Court has supplemental jurisdiction over Plaintiff's state law claims.

13.

Venue is proper as the Plaintiff, Koenig, and all named Defendants reside in this district.

## COUNT I:
## *QUI TAM* ACTION ON BEHALF OF THE UNITED STATES OF AMERICA

14.

Each prior paragraph is incorporated as if restated word for word.

15.

This action is brought on behalf of the United States to recover all damages and penalties and or any other remedy established and or allowed pursuant to 31 USCA §§3729-3733, and plaintiff claims entitlement to a portion of any recovery obtained by the United States as a *qui tam* plaintiff as authorized by 31 USCA 3730.

16.

The purpose of the FCA is to encourage any individual knowing of fraud perpetrated against the United States of America, to bring that information forward and permits suits against any person who defrauds the government by knowingly presenting a false or fraudulent claim for payment or approval. See 31 USC §3729-3733.

17.

Plaintiff's knowledge of the facts upon which this action is known to the Plaintiff in connection with his long-standing employment with the defendant, KBOCC, and knowledge of policies and procedures, as well as long-standing documentation, regarding the history and transformation of KBOCC into a Non-Profit Educational Corporation, operating independently in the secular world and off of the Reservation.

18.

Plaintiff also brings an action for wrongful retaliation as a result of his initial internal reporting of suspect conduct that resulted in Plaintiff being given more and more tasks outside of his normal duties and ultimately retaliation for reporting

4

suspected conduct to the Higher Learning Commission (HLC) that was, based on Plaintiff's information and belief, in violation of the FCA, and that he was immediately reprimanded after Defendants learned of his protected conduct, and shortly thereafter terminated in retaliation for that protected activity in violation of USCA 3730(h).

19.

Plaintiff became employed by the Defendant, KBOCC, on or about August 16, 2010, as a college professor and ultimately became Liberal Studies Department Chair.

20.

Plaintiff performed all of his positions, over a period of ten (10) years, in an exemplary fashion and was never disciplined until immediately after he reported the suspect activity to the Higher Learning Commission (HLC).

21.

By way of background, The HLC is an independent corporation that was founded in 1895 as one of six regional institutional accreditors in the United States. HLC accredits degree-granting post-secondary educational institutions in the United States.

22.

According to the HLC's website, the Organization is a gatekeeper to ensure that standards are met as a requirement of getting Federal Financial Aid (FFA). It states in relevant part that:

> "To serve the common good, HLC must create and maintain relationships with the federal government and other organizations with broader communities dependent on the quality of higher learning received in accredited colleges and universities. In most states in HLC's region, state legislatures have established governing or coordinating bodies to implement state policies meant to ensure that the citizens of the state have access to quality higher education.
>
> The federal government has a distinct interest in the role of accreditation in assuring quality in higher education for the students who benefit from federal financial aid programs. By being recognized by the U.S. Department of Education (USDE) as a gatekeeper agency,

HLC agrees to fulfill specific federally defined responsibilities within the accreditation processes"

### 23.

As a prerequisite to accreditation, and to qualify for FFA, the Defendant College agreed to be governed by criteria that is established by the Higher Learning Commission's (HLC) criteria for accreditation.

### 24.

Failure to meet the accreditation standards set forth by the HLC would have resulted in the loss of FFA for the Defendant KBOCC's students.

### 25.

Unfortunately, the Defendant's administration had a history of disdain and disregard of adhering to HLC standards.

### 26.

Various administrators of KBOCC that Plaintiff worked with had demonstrated their disdain and disregard for HLC standards, and their intentions to circumvent, ignore, and/or bypass certain accreditation requirements, that are part and parcel of HLC criteria needed to be met to achieve accreditation and qualify for FFA.

### 27.

The acting President of the KBOCC, Lori Ann Sherman, had expressed her opinion that the college should not have to adhere to HLC standards to get U.S. government monies, despite the fact that adherence to those HLC standards is a known requirement and a prerequisite to obtain government monies via FFA.

### 28.

Rather, the Defendant KBOCC viewed the HLC review that occurred approximately every four (4) years as an opportunity to cover-up elements of the Defendants' conduct, including but not limited to backdating surveys, elimination of the Assessment Coordinator/ Accreditation Liaison Officer position, that did not comport with HLC guidelines, and/or representations made to the HLC, all under a ruse to maintain eligibility for FFA for students of KBOCC, and receive monies from the United States that the Defendant KBOCC did not otherwise qualify for.

29.

President Sherman, intentionally, knowingly, fraudulently, and wrongfully submitted false claims, records and statements to officials of the HLC regarding KBOCC and meeting the requirements of the HLC, for the purpose of obtaining and maintaining accreditation, though not in compliance, for the exclusive purpose of extracting United States FFA that is essential to fund tuition for the vast majority of Defendant KBOCC's student body.

30.

Specifically, in 2016, after KBOCC received its accreditation, all of its guarantees and promises of fulfilling certain goals and requirements of accreditation such as climate surveys and other promised improvements were abandoned.

31.

As a result, in 2017, the HLC received a series of complaints from staff and/or faculty regarding the actions, or inactions, of the College.

32.

A new administration was hoped to be the solution to the problem, but, unfortunately, the same trends continued.

33.

Plaintiff, and others, tried to internally enlighten the new Administration as to how they were violating the accreditation requirements of HLC.

34.

The first victim of internal complaints was the former Assessment Coordinator/Accreditation Liaison Officer, Dr. Rebecca Frost, who once she put her concerns in writing, had her access to meetings eliminated, and access to vital information cut-off, resulting in her being constructively discharged when she quit in protest to the retaliatory conduct.

35.

Like Dr. Frost before him, the Plaintiff first attempted to solve the gaps in HLC compliance by filing internal complaints to the President, then the Chairman of the Board, and finally to the Board itself.

36.

In each instance the Plaintiff was met with stiff resistance and retaliation for his concerns including, but not limited to, being provided new and more tasks that were not within the parameters of his position.

37.

In response to Dr. Frost's concerns, the Chairman of the Board replied that if the HLC did not care about what the previous president (Debbie) did in 2017, they will not care about our deficiencies now.

38.

The KBOCC Administration knowingly did not follow HLC criteria for accreditation and viewed the once every four year review a mission to cover up its misdeeds, and does so for the sole purpose of keeping FFA funds coming to support essential operations of the College.

39.

The HLC required that there be an Assessment Liaison Officer (ALO), who acted as a conduit between the HLC and the educational institution.

40.

The HLC has a mandatory requirement that student learning, whether carried out by an ALO or by an Assessment Coordinator (AC), must be assessed.

41.

Assessment of student learning had been noted deficits in reports from the HLC for the years 2009, 2012, & 2016. Nevertheless, there had been 5 Assessment Coordinators in 10 years because each one had been stonewalled and/or eliminated by the Administration.

42.

As of May 8, 2020, three months after the other AC, Dr. Rebecca Frost, was forced out, there had still not even been a posting for her job and that was in direct contravention to the HLC report of 2016 that required interim reports as to how the then vacant Assessment Coordinator Position was being resolved.

43.

The interim reports drafted by KBOCC alleging that progress was being made in correcting the problem, was only achieved through the deception of the

Administration of KBOCC, as a full-time AC was only obtained by adding non- AC duties to a part-time employee.

44.

Under HLC protocols there was to be a Faculty Council that was comprised of a Dean of Instruction, Department Chairs and faculty who monitor educational needs and supervise courses with many internal requirements.

45.

Dean Virtanen systematically removed the Faculty Council from academic decision making and policy making and that the BOR had passed documents requiring Faculty Council approval, and submissions were made to the HLC requiring documents with FC approval.

46.

Plaintiff believed that the Defendant was in serious breach of the compliance standards set forth by HLC, as they pertained to the criteria for accreditation and had raised those concerns on many occasions.

47.

Plaintiff initially attempted to resolve these matters internally and, specifically, in February 2020, Plaintiff reduced some of his concerns in writing about Dean Vertanin's conduct and her attempt to get around appointing a permanent Assessment Coordinator/Accreditation Assessment Officer.

48.

Finally, on or about May 10, 2020, Plaintiff submitted a 29-page letter to the HLC detailing how the KBOCC, and the individual Defendants, were undermining HLC Requirements and lying and providing false information to the HLC and the Plaintiff further advised the Higher Learning Commission, that the KBOCC's 2016 Assurance Argument "was a work of fiction" [See Indexed documents Bates 57 to U. S. Attorney].

49.

The conclusion of attachment 1 makes clear, that Plaintiff believed that the new administration of the Defendant KBOCC "*has no intention of letting the Criteria of Accreditation guide its operations for the betterment of student learning. I believe that for the administration, HLC accreditation is only a means to get federal financial aid and other benefits, and the assurance argument is a cover-up that I am once again being asked to participate in*". *[Emphasis added]*.

50.

In a letter dated May 18, 2020, the HLC advised Plaintiff that it had reviewed the Plaintiff's Complaint regarding KBOCC, and declared: "*Upon initial review of your Complaint, HLC determined that the matter regarding Keweenaw Bay Ojibwa Community College raises potential concerns regarding the institution's compliance with the Criteria for Accreditation or other HLC requirements. Due to these potential concerns, HLC will conduct a further review of the institution based on your Complaint". (Emphasis added) [*See Indexed documents Bates 88 to U. S. Attorney].

51.

In an email, dated 5/11/20, Plaintiff advised the aforesaid Defendants that he was passing his complaint and concerns to the HLC.

52.

On May 12, 2020, within hours of Mr. Koenig advising KBOCC, via Dr. Virtanen, and others, that he had submitted a letter to HLC outlining the deficiencies of KBOCC, and the individuals administering KBOCC's practices, he was sent an email with three attached corrective action plans that were to be returned within 3 business days.

53.

Those correction action plans represented the first discipline of any type that the Plaintiff had received in ten (10) years of exemplary service for KBOCC, were pretextual in nature, and represented disparate treatment compared to those individuals who were similarly situated and had not engaged in protected activity.

54.

The Plaintiff properly grieved the disciplinary write-ups, but did not, as was required, have his concerns heard by an "independent grievance committee" as the process was outlined in the employee handbook.

55.

Rather, instead of having an "independent review" the President of KBOCC once again refused to abide by the appropriate policy, and, unilaterally, ruled against the Plaintiff.

56.

In responding to the writeups, the Plaintiff made clear that he was not refusing to perform any legitimate work functions, but that "I have made complaints over the

past year and expressed my concern with respect to the administration's violations of the HLC's Criteria of Accreditation. I am not refusing to do my work. I am only refusing to engage in any action that assists the Administration in avoiding accountability to the HLC by not hiring an Assessment Coordinator/Accreditation Liaison Officer or in any action which asks me to otherwise coverup administration's disregard for the HLC's Criteria of Accreditation." See Indexed documents Bates 267 to U. S. Attorney].

### 57.

As a direct and proximate result of the Plaintiff, Jesse Koenig's, investigations and allegations of the Defendants' fraud against the United States, in significant part for the purposes of extracting Federal Financial Aid for its students that it otherwise did not qualify for but for fraud, and to benefit named Defendants' individually, including avoidance and evasion of State Income Tax, Defendants undertook a series of retaliatory actions and ultimately terminated Plaintiff's employment on or about July 20, 2020 as a direct and proximate result of the Plaintiff's protected activity.

### 58.

That as a direct and proximate result of the Defendant's violation of the *Qui Tam* provisions of The False Claims Act, as herein before set forth, Plaintiff Koenig has suffered damages including termination of his employment, loss of income (double), loss of employee benefits including but not limited to pension, savings, and other retirement benefits, emotional distress, exemplary damages, costs, interest and attorney fees as allowed, whatever portion of the United States Government's recovery as allowed by law and by the Court, and all other relief necessary to make the employee whole.

WHEREFORE, Plaintiff prays for a judgment to be entered against KBOCC and the individual Defendants, as follows:

A) A finding that the Defendant KBOCC's conduct violated the *Qui Tam* provisions of the FCA and that the Plaintiff is entitled to his share of the proceeds that were fraudulently obtained from the United States via the fraud perpetrated by said Defendants;

B) Directing the Defendants to pay Plaintiff compensatory damages including but not limited to double actual wage loss, benefits, fringe benefits, sick leave, pension benefits, and any other monetary compensation that the Plaintiff was deprived of as a result of the Defendant's unlawful conduct

and punitive damages for intentional, willful or a total disregard to the Plaintiff's statutory rights;

C) Pay the Plaintiff all future damages as proven at the time of trial including all time necessitated to commute to his new employment and associated expenses;

D) Pay the Plaintiff all other fringe benefits, sick leave, etc…that he would have received but for the retaliatory and discriminatory conduct of the Defendants and all other relief allowed by the Federal False Claims Act including interest, costs, attorney fees, exemplary and punitive damages as the Defendants' conduct was made with an intentional disregard to the federally protected rights of the Plaintiff;

E) Declaring the Defendants' actions to be willful, wanton, malicious, intentional and in direct disregard to the Plaintiff's well established federally protected rights and directing the Defendant to pay Plaintiff punitive damages in an amount to be proven at trial; and

F) Grant any other relief, equitable or legal that the Court deems reasonable.


## COUNT II
## UNLAWFUL RETALIATION IN VIOLATION OF 31 USCA §3730(h)

### 59.

Plaintiff repeats each prior paragraph as if repeated line for line and word for word.

### 60.

Prior to reporting his concerns regarding the Administration's circumvention and obstruction of the policies and procedures of the HLC, both internally and ultimately externally to the HLC, Plaintiff Koenig had a pristine record with not a single write up, reprimand, or discipline in the ten (10) years he worked for KBOCC.

### 61.

On May 10, 2022, Plaintiff Koenig sent a letter to the HLC (attached as 1) describing a panoply of violations and misrepresentations that the KBOCC had made

to the HLC to enhance and facilitate its ability to continue to qualify for FFA for its students. [See Indexed documents Bates 57 to U. S. Attorney].

62.

The Complaint to the HLC chronicled, in large part, the internal complaints that Koenig had been addressing to the KBOCC Administration, however there were additional information given to the HLC including but not limited to unethical hiring practices, undermining assessment efforts, providing backdated and incorrect information on new program development, all in the context of issues that violated relevant HLC Criteria for Accreditation and said information was backed up with supporting documentation and is more fully described in the document Bates 57 to U. S. Attorney.

63.

Within hours of Plaintiff admitting to the Defendant that he filed the Complaint to the HLC, and advising College personnel of the same, Koenig received three corrective actions in an email that represented the entirety of corrective action writeups the plaintiff had received over a 10-year span of highly effective work.

64.

Plaintiff also had his budget for program review reduced shortly after he made his complaint to the HLC.

65.

Typical internal policies were not followed.

66.

According to College policy, Plaintiff timely appealed these pretextual write-ups.

67.

However, contrary to following the College policy of forming a grievance committee, and staying out of the appeal process, the President, Lori Ann Sherman, unilaterally dismissed Koenig's appeal.

68.

Koenig was then provided a "Corrective Action Plan" and Koenig, again, followed proper procedure and appealed the action.

69.

Again, President Sherman ignored the relevant policy and dismissed the appeal.

70.

The Plaintiff was, at this time, on summer break, and despite that he was not actively performing duties, he was emailed more pre-textual Corrective Actions.

71.

On July 20, 2020, while off on summer vacation, and only a very short period of time after Plaintiff submitted a formal complaint to the HLC, Plaintiff received a letter from President Sherman that after an unblemished ten-year period, he was being terminated and not having his contract renewed.

72.

According to the policy, plaintiff again appealed.

73.

Per the Defendant's handbook, an appeal committee was supposed to be performed within 10 days, but instead, plaintiff's appeal was ignored completely.

74.

After the plaintiff's termination, defendant's administration sent an email to all staff advising them that they were not supposed to talk to the plaintiff.

75.

Plaintiff asserts that his contract was not renewed because of his protected activity under the FCA of reporting fraud and deceit to obtain FFA for its students despite the fact that KBOCC was not complying with the letter and/or spirit of complying with HLC requirements to receive FFA.

76.

Also, within hours of the Plaintiff submitting his Complaint to the HLC, the Defendant, after leaving the AC/ALO position vacant for many months, (the position that was vacated by the constructive discharge of Dr. Rebecca Frost, who had voiced many of the concerns that the Plaintiff had) coincidentally posted an open position for immediate hire for the AC/ALO position.

77.

Moreover, while the position was posted as a "full-time" position, it was then told to a prospective applicant, that the position was only "part-time".

78.

The reality was that in June 2020 the Defendant hired a "part-time" AC.

79.

At the time of the Defendants' unlawful retaliation, Plaintiff had been admitted to a Master of Fine Arts program at the University of Houston Victoria, to achieve the terminal degree in the Plaintiff's field that had been approved by Defendants, and that the Defendant had agree to pay for said program, which cost approximately $27,000.00.

80.

As a result of the unlawful retaliatory discharge, Plaintiff was forced to abandon his quest of his terminal degree based on the lack of funding.

WHEREFORE, Plaintiff prays for a judgment to be entered against KBOCC and the individual Defendants, as follows:

G) A finding that the retaliatory acts, including but not limited to the termination of the Plaintiff after he opposed violations of the FCA, are in violation of the anti-retaliation provisions found in 31 USCA §3730(h);

H) Directing the Defendants to pay Plaintiff compensatory damages including but not limited to double actual wage loss, benefits, fringe benefits, sick leave, pension benefits, payment for his Master of Fine Arts Program, and any other monetary compensation that the Plaintiff was deprived of as a result of the Defendant's unlawful conduct.

I) Pay the Plaintiff all future damages as proven at the time of trial;

J) Pay the Plaintiff all other fringe benefits, sick leave, etc... that he would have received but for the retaliatory and discriminatory conduct of the Defendants and all other relief allowed by the Federal Claims Act including interest, costs, attorney fees, exemplary and punitive damages as the Defendants' conduct was made with an intentional disregard to the federally protected rights of the Plaintiff;

K) Declaring the Defendants' actions to be willful, wanton, malicious, intentional and in direct disregard to the Plaintiff's well established federally protected rights and directing the Defendant to pay Plaintiff punitive damages in an amount to be proven at trial; and

L) Grant any other relief, equitable or legal that the Court deems reasonable.

## COUNT III
## VIOLATION OF MCLA 408.473 & MCLA 408.475 REFUSAL TO PAY ACCRUED SICK LEAVE/VACATION PAY.

81.

Plaintiff incorporates each prior paragraph as if repeated word for word and paragraph for paragraph.

82.

In addition to the retaliatory termination, Defendant, KBOCC, failed to pay the Plaintiff his accumulated sick leave which amounted to approximately $22,000 as was required to be paid by the handbook that he was provided and all such earnings and benefits were earned while the Plaintiff worked in L'Anse MI., off the Reservation and on secular land at the building in L'Anse.

83.

Specifically, Koenig was advised in the Handbook that he was provided, "in case of dismissal, termination, or resignation, employees will be paid for accumulated sick leave".

84.

Plaintiff was never advised, nor was he ever instructed, to sign any document that forfeited accumulated benefits nor was he ever provided a new handbook that took away vested rights.

85.

Moreover, Koenig was advised if the policy would ever change, he would be notified and that any sick leave accumulated up to that point would be grandfathered in and preserved.

86.

MCLA 408.475.    <u>Voluntary Termination of Employment; Discharge</u>: provides as follows:

Sec. 5. (1) An employer shall pay to an employee voluntarily leaving employment all wages earned and due, as soon as the amount can with due diligence be determined. However, an employer shall pay all wages earned and due to an employee engaged in any phase of the hand harvesting of crops as soon as the amount can, with due diligence, be determined, but, in any event, not later than 3 days after the employee's voluntary termination of employment.

(2) An employer shall immediately pay to an employee who has been discharged from employment all wages earned and due, as soon as the amount can with due diligence be determined.

87.

Likewise, MCLA 408.473 provides:

Sec. 3. An employer shall pay fringe benefits to or on behalf of an employee in accordance with the terms set forth in the written contract or written policy.

88.

Pursuant to the only Sick Leave Policy the Plaintiff, Koenig, had been provided: the Policy stated: "In case of dismissal, termination, or resignation, employees will be paid for accumulated sick leave. [See Indexed documents Bates 314 to U. S. Attorney].

89.

Plaintiff, in addition to all other damages, is entitled to the approximately $22,000 that he had accumulated in Sick Leave before being retaliatorily terminated pursuant to the appropriate provisions of the False Claims Act and MCLA 408.473 including all costs, interest and attorney fees.

WHEREFORE, Plaintiff prays for a judgment to be entered against KBOCC and the individual Defendants, as follows: A finding that the Plaintiff be paid the following economic damages:

A) including but not limited to actual wage loss, benefits, fringe benefits, sick leave, pension benefits, and any other monetary compensation that the Plaintiff was deprived of as a result of the Defendant's unlawful conduct.

B) Pay the Plaintiff all other fringe benefits, sick leave, etc. … that he would have received but for the retaliatory and discriminatory conduct of the Defendants and all other relief allowed including interest, costs, attorney fees, exemplary and punitive damages as the Defendants' conduct was made with an intentional disregard to the federally protected rights of the Plaintiff;

C) Declaring the Defendants' actions to be willful, wanton, malicious, intentional and in direct disregard to the Plaintiff's well established federally protected rights and directing the Defendant to pay Plaintiff punitive damages in an amount to be proven at trial; and

D) Grant any other relief, equitable or legal that the Court deems reasonable.

Respectfully Submitted,

HURLBURT, TSIROS & ALLWEIL, P.C.

BY:_____
MANDEL I. ALLWEIL (P34115)
Attorney for Plaintiff
821 South Michigan Avenue
P.O. Box 3237
Saginaw, MI 48605
(989) 790-3221

Dated: May 25, 2023

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

United States of America
*ex rel.* Jesse Koenig, and
Jesse Koenig individually,

      Plaintiffs,

-vs-

                          Case No._____
                          Hon._____

Keweenaw Bay Ojibwa Community College,
Lori Ann Sherman (President),
Beth Louise Vertanin (Dean of Instruction), & Robin Chosa
(Chairman of the Board) Individually and as
Representatives of Keweenaw Bay Ojibwa
Community College,

      Defendants.

_____/

**JURY DEMAND**

**PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY**

                HURLBURT, TSIROS,  & ALLWEIL, P.C.

                BY:_____
                    MANDEL I. ALLWEIL (P34115)
                    Attorneys for Plaintiff
                    821 S. Michigan Avenue
                    P.O. Box 3237
                    Saginaw, Michigan 48605
                    (989) 790-3221

May 25, 2023

PRESS FIRMLY TO SEAL

# PRIORITY
## ★ MAIL ★

📅 **DATE OF DELIVERY SPECIFIED\***

📶 **USPS TRACKING™ INCLUDED\***

💲 **INSURANCE INCLUDED\***

🚚 **PICKUP AVAILABLE**

**\* Domestic only**

**WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.**

PRESS FIRMLY TO SEAL

TYVEK® IS RECYCLABLE.
HDPE  ©2003, DUPONT™ AND TYVEK® ARE TRADEMARKS OF DUPONT.

PRESS FIRMLY TO SEAL

**FROM:**

HURLBURT, TS
821 Sout
P.
Sagina

Hurlbur
82

Sa


PS00000000013

**EP14 July 2013**
**OD: 11.625 x 15.125**









**US POSTAGE**
**$ 010.55**
Priority Mail - IM
ZIP 48602
05/25/2023
033A 0071801240

Please Recycle

ROS & ALLWEIL, P.C.
Michigan Avenue
Box 3237
MI 48605-3237

Isiors & Allweil P.C.
, Michigan Ave
) Box 3237
iaw, MI 48605

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14 © U.S. Postal Service; July 2013; All rights reserved.

DuPont™ Tyvek®
Protect What's Inside.™

T US AT USPS.COM®
ER FREE SUPPLIES ONLINE




**UNITED STATES POSTAL SERVICE.**